NYC Commission on Human Rights

Deyanira Gomez
164 John St.
Staten Island, NY 10302
Complaint No M-E-D-11-1024738-D

To NYC Commission on Human Rights,

I am writing to request that the NYC Commission on Human rights review the decision on Complaint No. M-E-D-11-1024738-D Federal Charge #16 F-2011-00187. The conclusion of the ruling states that my failure to follow orders, failure to show evidence of requesting reasonable accommodations and long history of misconduct as reasons for ruling. Furthermore, the letter cites specific alleged incidents to support this. Below I will offer a response and supporting documentation to dispute these allegations.

## Background- Alleged long history of misconduct

The first 14 years of my career, 1994 through 2008, or my pre-injury years, show my body of work as an exemplary police officer for the New York City Police Department. During this time, I received numerous commendations for my work and no record of the alleged misconduct or insubordination, or "acting against my self interest" mentioned in your determination letter. On April 03, 2008, I suffered an injury while on duty at the Manhattan Detention Center, where the front gate to the center malfunctioned and came down me. I suffered a torn rotator cuff, multiple herniated spinal discs, and damage to my central nervous system. After suffering from continuous debilitating

pain for months after the injury, I was subsequently diagnosed with Post Traumatic Fibromyalgia and Post Traumatic Stress Disorder.

April, 03, 2008, the date of my on duty injury, marks the turning point of my career and my life.

> On March 2, 2009, Complainant was transferred to Brooklyn Courts, located at 210 Joralemon Street. Brooklyn Courts oversees the arrest process, and acts as liaison with the Brooklyn District Attorney's office. Her duties included data entry, paperwork, and other light clerical tasks.

On March 2, 2009 I was transferred to the Expedited Arrest Processing Bureau at 210 Joralemon St., Brooklyn, NY, a command that consisted of high volume time sensitive administrative work. It is widely known as one of the busiest high pressured administrative offices within the NYPD. Due to my condition and the medication I was taking to manage my condition, I struggled to perform as required.

> On June 11, 2009, Complainant reported to Respondent Galvin that she was suffering from anxiety attacks. She further stated that she was taking Depakote, Cymbalta, Neurontin, and Valcor, which prevented her from driving and were causing her to work slowly. According to Respondents, Complainant also told Respondent Galvin that she was drinking alcohol. Complainant disputes this in her rebuttal. Respondent Galvin referred Complainant for a psychological evaluation. She was thereafter directed to Respondent NYPD's counseling unit.

> Complainant was then ordered to enter in-patient alcohol treatment. She refused to do so, and was thus suspended for thirty days. On June 15, 2009, Complainant was served with charges for violating Respondent NYPD's order that she enter an in-patient alcohol treatment

As a person with herniated discs/ nerve damage and diagnosed with Post Traumatic Fibromyalgia and Post Traumatic Stress Disorder (as a result of April 2008 injury), the high stress environment was not conducive to my health and produced anxiety attacks.

Police Officers that are admitted alcoholics are have shown a pattern of behavior that can be associated to alcoholism such as smelling of alcohol on the job or excessive lateness/ absenteeism are referred to the in-patient alcohol treatment program. Neither of the above applied to me and I did not want to be forced to treat a problem that didn't exist. Any medication taken at the time was prescribed to me by medical professionals to treat my deteriorating health and current condition.

Requests for Reasonable Accommodations

Complainant [...] that on or about May 25, 2010, and again on or about June 9, 2010, she requested a transfer from Brooklyn Courts to an assignment at which she would not be required to work overtime. Respondent NYPD denies having received either request.

Complainant provided two medical notes from her neurologist, one dated May 25, 2010, and one dated October 21, 2010. Each note states, inter alea, that Complainant is limited to working an eight-hour day because of her fibromyalgia. Complainant asserts that she gave the May 25, 2010, note to Respondent Galvin, and that Respondent Valenti was present when she did so.

Respondent Galvin denied receiving the May 25, 2010, note, and Respondent Valenti denied ever having seen it. During his first interview with the Commission, Respondent Galvin stated that when a police officer claims an off duty injury or illness, he, Respondent Galvin, gives the police officer a form letter to take to his or her personal physician. According to Respondent Galvin, he would have signed such a form. The forms that Complainant provided to the Commission include her neurologist's signature, but do not include Respondent Galvin's signature.

The Commission finds insufficient evidence to support Complainant's allegation that she gave her neurologists May 25, 2010, note to Respondent Galvin, or otherwise communicated to Respondents that she could not work overtime due to her disabilities. Complainant only provided unsigned copies of her purported 2010 requests to the Commission. Accordingly, there is no documentary evidence that she submitted them to Respondents.

4

It is very crucial in this investigation for the NYC Commission on Human Rights to investigate the scope, duties and the responsibility of a Police Surgeon and the Absence Control Unit. It would also be helpful to clarify the difference between limited duties and restricted duties, and, the time a police officer can remain in this capacity in addition to the various different reports used by the NYPD medical division. As mentioned numerous times before. The NYPD in addition to denying multiple request for reasonable accommodations has violated Federal HIPAA privacy rules for the protection of Health and Mental Health Information. This is clearly evident in the notes taken by Investigator Raymond Wayne and signed by Deputy Commissioner Clifford Mulqueen in this determination.

As mandated by the special medical division, all police officers are required to have NYPD treating physician summary reports completed by their doctors and handed to the police surgeon on

every visit. This implemented procedure helps in determining the duty capability. The indictment is to exclude it in a police officer's assignment (consultation referral - Medical Division Form#PD 429-180, Sick Report Continuation form PD 429-124, Sick Report Finest Control, Treating Physicians Summary Report, Medical History Report. * The Treating Physicians summary report is the only NYPD report a police officer hands in to the police surgeon and does not require the signature of the police surgeon (i.e. Peter Galvin). This report was handed to Police surgeon Galvin on every visit to the special medical division. In addition no complaints were made against me for failing to provide MD Galvin or any other doctors with mandated reports as per the guidelines of The Special Medical Division.

The NYPD Medical Division, Special Medical Division and The Psychological Unit are governed under the HIPAA privacy rules for the Protection of Health and Mental Health Information. Doctors assigned to this unit are also governed under Hippocratic Oath to uphold specific ethical and professional standards which have been breached. (malpractice/civil penalties. Professional conduct injurious to patients) MD Galvin on numerous occasions violated HIPAA rules by allowing Lt. Domenique Valenti, a non provider of health care or a doctor, to remain in his medical office during routine examinations and discussions of health and Mental health information and records protected by Federal Privacy Laws, State Privacy Laws including Mental Hygiene Law section 33.13, the Public Health Laws and Civil Practice Laws and rules. In addition, MD Galvin without my consent produced and discussed my medical status with him and subsequently based my restrictions at work on Lt. Valenti's non medical opinions. These conversations took place right outside the room where I was being examined. The fact that medical decisions where being influence by non-medical opinions resulted in being assigned to work that further deteriorated my injuries. The medical proof of additional injuries are clearly noted on the numerous MRI reports provided

to MD Galvin and to which he admitted to receiving during this investigation.

to MD Galvin and to which he admitted to receiving during this investigation.

Respondent Spano stated to the Commission that Complainant frequently told him that she could not work overtime because she was not feeling well. Respondent Spano, correctly did not enquire into the nature of Complainant's illness but instead directed her to the administrative office at Brooklyn Courts. Complainant's statement to Respondent Spano that she was not feeling well does not constitute notice to Respondents that she could not work overtime due to her disabilities.

The Treating Physician Summary Report outlining my medical conditions was presented to Respondent Spano. Furthermore, Respondent Spano understood that I was temporarily assigned to that command due to my medical restrictive duty status. Again, it is very crucial in this investigation for the NYC Commission on Human Rights to clarify the difference between limited duties and restricted duties, and, the fact that time a police officer cannot perform overtime while under restrictive status as per the police department administrative guide.

Further undermining Complainant's credibility is her conduct during the course of the investigation, which conduct is consistent with that which she engaged in while in Respondent NYPD's employ. For instance, on July 12, 2013, Complainant called the investigator assigned to her Complaint, and stated that she wanted to meet with him to discuss her Complaint. The investigator stated that he needed to call her back to schedule the appointment. When he asked Complainant for her telephone number, she refused to give it to him, stating, in words or substance, "I'm not giving my phone number to nobody!"

All contact information to include address, email, and new home tel. number were provided as requested.

Complainant then attempted to reach the investigator's supervisor. The investigator made numerous attempts to reach Complainant at the only telephone number in the investigatory file. In each instance, the line was busy. The investigator also attempted to reach Complainant via e-mail. However, the message was returned as undeliverable. Thereafter, the investigator wrote to Complainant at her home address, and asked her to call him in order to schedule an appointment.

All contact information to include address, email, and new home tel. number were provided as requested. I have records of numerous email exchanges between investigator and myself. The supervisor reached me via phone to discuss my concerns about the case. I reached out to the supervisor due to concerns over lack of transparency with the ongoing investigation and because I was wanted to amend my complaint to additional factors.

On September 16, 2010, Complainant was ordered to report on the following day for psychological evaluation, but failed to report. Complainant was charged for this infraction, and for refusing to open the door at her residence when a NYPD sergeant arrived to conduct an assessment there to determine whether she was at home. On September 21, 2010, Complainant was suspended for thirty days for these alleged infractions.

On September 16, 2010, the NYPD sergeant and NYPD Captain reported to my home with a SWAT team and helicopters to conduct the supposed "check at home". I calmly stated that due to the manner of this aggressive visit to my home I felt more comfortable granting access only after the arrival of my sister; Amy Gomez. After the arrival of my sister Amy Gomez, the NYPD was allowed entry into my home.

Upon Complainant's return from this suspension on October 20, 2010, Respondent NYPD directed her to report to the Bronx Courts unit ("Bronx Courts") at 7:37 a.m. on the following day, for a tour to run to 4:00 p.m. Complainant did not appear at Bronx Courts at the time she was directed to do so, and did not call in. Respondent NYPD made several attempts to reach her by telephone, and sent a sergeant from the precinct in which she resides to her home to ascertain her whereabouts. These attempts were unsuccessful.

On October 20, 2010, I did report to the Bronx Courts unit and recorded my attendance on the sign in log. Due to the heavy medication being administered to treat my Post Traumatic Fibromyalgia, Post Traumatic Stress Disorder and the duration of the commute from my home in Staten Island I did arrive shortly after 7:37 am. However; in subsequent unemployment hearings (NYPD also attempted to deny the issuance of unemployment benefits), the overseeing judge did not classify this as an infraction because it was my first day of work and did not have any specific duties assigned to me. As a result, the time of my arrival did not present eminent danger to the operations to the Bronx Courts Unit.

# FACTS ABOUT FILING
# AN EMPLOYMENT DISCRIMINATION SUIT
# IN FEDERAL COURT IN NEW YORK STATE

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. However you should contact the court directly if you have questions where to file your lawsuit. New York State has four federal districts:

- The United States District Court for the Southern District of New York is located at 500 Pearl Street in Manhattan. It covers the counties of Bronx, Dutchess, New York (Manhattan), Orange, Putnam, Rockland, Sullivan, and Westchester. (212) 805-0136 http://www.nysd.uscourts.gov

- The United States District Court for the Eastern District of New York is located at 225 Cadman Plaza in Brooklyn and covers the counties of Kings (Brooklyn), Nassau, Queens, Richmond (Staten Island), and Suffolk. (718) 613-2600 http://www.nyed.uscourts.gov

- The United States District Court for the Western District of New York is located at 68 Court Street in Buffalo. It covers the counties of Allegheny, Cattaraugus, Chautauqua, Chemung, Erie, Genesee, Livingston, Monroe, Niagara, Ontario, Orleans, Schuyler, Seneca, Steuben, Wayne, Wyoming, and Yates. (716) 551-4211 http://www.nywd.uscourts.gov

- The United States District Court for the Northern District of New York is located at 100 South Clinton Street in Syracuse and covers the counties of Albany, Broome, Cayuga, Chanango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Greene, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneida, Onandaga, Oswego, Ostego, Rensselaer, St. Lawrence, Saratoga, Schenectady, Schoharie, Tioga, Tompkins, Ulster, Warren, and Washington. This District Court's *Pro Se* Attorney has offices at 10 Broad Street in Utica New York. (315) 234-8500 http://www.nynd.uscourts.gov

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit must be filed in U.S. District Court within **90 days** of the date you receive the enclosed EEOC Notice of Right To Sue. Otherwise, you will have lost your right to sue.

(Over)

On August 15, 2013, Complainant called the investigator, and they scheduled an appointment for August 22, 2013, at 2:00 p.m. Complainant did not appear for the appointment, and did not call or write to inform the investigator that she could not keep the appointment.

All appointments were confirmed after verifying the availability of my brother Milton Gomez whom accompanied me on all appointments with the investigator.

On October 21, 2013, Complainant called the investigator and asked to schedule an appointment. She stated that she had not appeared on August 22, 2013, because the person who was going to accompany her had to work. She offered no explanation for her failure to contact the investigator on that date. Nonetheless, the investigator gave Complainant an appointment for October 24, 2013, at 3:00 p.m.

Cancellations or changes to meeting times and reasons were communicated. Again I refer back to my Post Traumatic Fibromyalgia and Post Traumatic Stress Disorder and the debilitating pain that can cause me to alter plans on certain occasions.

On October 24, 2013, Complainant did not appear at 3:00 p.m., and did not communicate with the investigator at or before that time. At approximately 3:25 p.m., the investigator received a call from a man stating that he was calling on Complainant's behalf, and that she was stuck in traffic. Complainant arrived at approximately 4:00 p.m., accompanied by her brother. She offered no apology for being an hour late. It was Complainant's brother who had called the investigator to tell him that Complainant was stuck in traffic.

On October 24, 2013 my brother Milton Gomez, whom accompanied me to all meetings with the investigator, and who had permission to speak on behalf, called to inform of my delay.

---

I have written this letter because I would like to appeal and I do not agree with the decision made in my complaint and I would reviewed. Thank you for your time.

Sincerely

*[signature]*

Deyanira Gomez

7-7

WRONGFUL ARREST

Top-rated attorney fights for wrongfully arres...

**N.Y. / Region**　　　　　　　　　　　　　　　　　　　　　　　　SUBSCRIBE    LOG IN

# New Commissioner Vows to Revitalize Agency That Fights Discrimination in New York

  



Carmelyn P. Malalis is the newly appointed leader of the Commission on Human Rights. "I know that we're going to do some great work here," she said.
CHANG W. LEE / THE NEW YORK TIMES

MARCH 8, 2015

**The Working**　　Every year, thousands of New Yorkers turn to the Commission on

Life

Human Rights, the city agency responsible for battling discrimination in the workplace, the housing market and beyond.

By RACHEL L. SWARNS

They describe sexual harassment and racial discrimination on the job, public buildings that remain inaccessible to disabled people, and landlords who refuse to rent to people who receive public assistance.

Then they wait. And wait. And wait.

Finally, some people realize what city officials already know: The commission, the watchdog empowered to investigate and prosecute violators of the city's anti-discrimination law, is largely toothless. The agency files too few cases, initiates too few investigations, levies too few fines and fails to meet its own timelines for resolving complaints, officials say.

That is why Carmelyn P. Malalis, the new commissioner appointed by Mayor Bill de Blasio, received such a warm welcome last week from members of the City Council and advocates for the poor. In her second week on the job, Ms. Malalis was vowing to vigorously enforce the law and to revitalize the chronically underfinanced agency, which primarily serves residents who cannot afford to hire their own lawyers.

"I get that folks want to see results," Ms. Malalis, a 40-year-old lawyer who specializes in workplace discrimination cases, said in an interview. "I know that we're going to do some great work here."



ADVERTISEMENT

This Sunday is the TCS NYC Marathon. Could a kangaroo go faster than you?

FIND OUT

TATA CONSULTANCY SERVICES | TCS NEW YORK CITY MARATHON

She certainly received a boost from the City Council speaker, Melissa Mark-Viverito, a Democrat from East Harlem, who promised last month to add $5 million to the commission's $6.9 million budget in the coming fiscal year, enough to more than double the number of staff lawyers while also increasing the number of human rights specialists.

Even so, reinvigorating the commission will be no easy task.

"You have your work cut out for you," Councilwoman Deborah Rose, a Democrat from Staten Island, told Ms. Malalis, who testified before the Council's civil rights committee last week.

That would be an understatement.

The city, which financed 173 positions at the commission in 1992, now pays for only 11. (The federal government provides funding for an additional 55 positions.) And it shows.

The commission received 4,975 inquiries from the public in 2014, but formally opened only 633 cases, city statistics show. Of the cases resolved that year, only 10 percent were found to have probable cause to move forward. (Lawyers for the indigent, who believe many more cases are viable, say the agency's staff receives inadequate training in how to enforce the law.)

And when new cases are opened, the commission often fails to investigate them in a timely manner. An audit released by the New York City comptroller's office last week found that less than half of all cases closed from Jan. 1, 2012, to June 14, 2013, were resolved within the agency's internally established one-year timeline.

Despite those problems, the commission has "not analyzed its case files to identify the key factors that affected its case processing and caused delays," Scott M. Stringer, the city comptroller, wrote in a letter that accompanied the audit.

All of this means that Ms. Malalis, a former partner at Outten & Golden, an employment law firm, has plenty on her plate.

Ms. Malalis, who replaces Patricia L. Gatling, an appointee of former Mayor Michael R. Bloomberg, has already begun reviewing the commission's operations, its cases and how it investigates and processes complaints. She also wants to initiate more proactive investigations and respond to public complaints.

But that will take time, Ms. Malalis said at last week's City Council hearing, voicing